UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| CHRISTOPHER L. BRUCE,            )<br>                                                       )<br>              Plaintiff,                       )<br>                                                       )<br>v.                                                  )<br>                                                       )<br>NORFOLK SOUTHERN RAILWAY )<br>COMPANY, YELLOW CAB COMPANY )<br>OF LOUISVILLE, LLC, PROFESSIONAL )<br>TRANSPORTATION, INC. and         )<br>ANTHONY K. SHIELDS,             )<br>                                                       )<br>              Defendants.                  )  | No. 3:20-cv-00040-RLY-MPB |

## **PLAINTIFF'S FINAL WITNESS AND EXHIBIT LIST**

Now comes Plaintiff, Christopher L. Bruce, by and through his attorneys, The Brennan Law Firm, P.C., and for his Final Witness and Exhibit List states as follows:

## **I. WITNESSES**

Plaintiff identifies individuals likely to have discoverable information which Plaintiff may use to support his claims, except for individuals whose testimony may be used solely for impeachment purposes:

1. Christopher L. Bruce, Plaintiff
   Christopher may testify as to his personal history, his employment history, his health prior to the incident alleged in his complaint, his job duties and requirements, his training, and responsibilities.

   Christopher may testify regarding the incident of April 16, 2018, how and why the incident occurred, the actions and statement of Defendant Shields before, during, and after the crash, whether there were any witnesses, any observations he made before, during, and after the crash, the weather conditions at the time of the incident, his interactions with Mr. Merrell and Mr. Chand, and and the general scene of the incident.

   Christopher may testify regarding the medical treatment he received following his

injury, his physical limitations and disability, his medical expenses incurred to date, his lost income, the pain and disability he has suffered in the past, and the pain and disability he continues to suffer. Christopher may testify regarding his medical restrictions placed on him by Dr. Gornet; as well as his efforts to find alternate employment that he is able to perform given his physical restrictions. Christopher is expected to testify consistently with his discovery produced and the deposition he has given in this matter.

2. Samantha Bruce, Plaintiff's spouse, 3836 Cliff Ave., Louisville, KY 40215
   Samantha is expected to testify that she is the spouse of Christopher Bruce. Samantha may testify as to her observations of plaintiff before and after the incident, plaintiff's medical care and treatment, plaintiff's activities before and after his injury of April 16, 2018, his job duties and requirements, his work history, and his limitations and disabilities since the incident. She is expected to testify consistently any deposition she may give in this matter.

3. John Humphrey, Norfolk Southern Railway Company
   John may testify regarding the incident of April 16, 2018, how and why the incident occurred, the actions and statements of Defendant Shields before, during, and after the crash, whether there were any witnesses, the weather conditions at the time of the incident, complaints made by Plaintiff after the crash, observations he made of Plaintiff following the crash, his interactions with Mr. Merrell and Mr. Chand, and the general scene of the incident. John may testify regarding injuries he sustained as a result of the crash. John is expected to testify consistently with the deposition he has given in his personal injury lawsuit against Defendants.

4. Co-Defendant Anthony Shields, is expected to testify as to the events that occurred after the Plaintiff got in his cab, including the speed of the cab, why the crash occurred, the impact as well as Plaintiff's and Mr. Humphrey's comments and injury complaints. He is expected to testify that he was also injured in the crash. Mr. Shields is expected to testify consistently with any deposition he may give in this matter.

5. Michael Chand, Norfolk Southern Railway Company
   Mr. Chand may testify that he was a trainmaster for the area which included the Plaintiff's train as well as his job duties as a Trainmaster. He may testify as to his knowledge of the crash, his investigation into the crash, statements made by Plaintiff and John Humphrey, the actions of Thomas Merrell, observations and the interaction he and Mr. Merrell had with Plaintiff and Mr. Humphrey at the hospital where Plaintiff was being treated. He is expected to testify consistently with the deposition he gave in cause 019FRS00112 currently pending before the U.S. Department of Labor. He is expected to testify regarding the investigation letter sent to Plaintiff, the cancellation of the investigation hearing that was set for Plaintiff, his understanding of Norfolk Southern's rules, and his belief that Plaintiff did not violate Norfolk

Southern's rules at the time of the crash.

6. Thomas Merrell, Retired, Norfolk Southern Railway Company
   Mr. Merrell may testify that he was the Terminal Superintendent for the area which included the Plaintiff's train as well as his job duties as Terminal Superintendent. He may testify as to his knowledge of the crash, his investigation into the crash, statements made by Plaintiff and John Humphrey, the actions of Mr. Chand, observations and the interaction he and Mr. Chand had with Plaintiff and Mr. Humphrey at the hospital where Plaintiff was being treated. He is expected to testify consistently with the deposition he gave in cause 019FRS00112 currently pending before the U.S. Department of Labor. He is expected to testify regarding the investigation letter sent to Plaintiff, the cancellation of the investigation hearing that was set for Plaintiff, his understanding of Norfolk Southern's rules, and his belief that Plaintiff did not violate Norfolk Southern's rules at the time of the crash.

7. Dr. Douglas Mattingly and other medical care providers from Iroquois Medical, 5601 South 3rd St., Suite 100, Louisville, KY 40214.
   Dr. Mattingly and his coworkers may testify regarding the care and treatment provided to Christopher following the subject crash. They are expected to testify consistently with their medical records.

8. Kevin Blanton, Union Representative, Norfolk Southern Railway Company
   Mr. Blanton may testify regarding the investigation letter sent to Plaintiff by Defendant Norfolk Southern Railway Company regarding the crash and the subsequent cancellation of the investigation. He may testify regarding any conversation he had with Mr. Chand and Mr. Merrell regarding Plaintiff and the subject crash and subsequent investigation.

9. Trainmaster Boyer, Norfolk Southern Railway Company
   Mr. Boyer may testify as to his knowledge of the subject crash and his interactions with Plaintiff and Mr. Humphrey before and after the crash.

10. Steve Kaiser, Norfolk Southern Railway Company
    Mr. Kaiser is expected to testify to what he saw with respect to the accident from the train in which he was riding that was passing by the crossing where the accident occurred.

11. Paul Kaiser, Norfolk Southern Railway Company
    Mr. Kaiser was in the train that Plaintiff and Mr. Humphrey and he and George Layman relieved the Plaintiff and Mr. Humphrey and is expected to testify as to his observations of the accident.

12. George Layman, Norfolk Southern Railway Company
    Mr. Layman was in the train that Plaintiff and Mr. Humphrey and he and Paul Kaiser

relieved the Plaintiff and Mr. Humphrey and is expected to testify as to his observations of the accident.

13. Megan Wilson, Norfolk Southern Railway Company
    Ms. Wilson may testify as to her knowledge of the subject crash and her interactions with Plaintiff and Mr. Humphrey before and after the crash.

14. A. G. Valdivia, Sr. Governmental Reporting Officer, Norfolk Southern Railway Company.
    Mr. Valdivia may testify as to his knowledge of the subject crash and his interactions with Plaintiff and Mr. Humphrey before and after the crash.

15. Investigating Officers from the Indiana State Police and/or Harrison County Sheriff's Department. These officers may testify as to their knowledge of the subject crash, their investigation into the crash, and their interactions with Plaintiff, Mr. Humphrey, and Defendant Shields after the crash.

16. Douglas Pickle, District Claim Agent, Norfolk Southern Railway Company
    Mr. Pickle may testify as to his knowledge of the subject crash and his interactions with Plaintiff and Mr. Humphrey before and after the crash.

17. Medical care providers from Harrison County Hospital, 1141 Hospital Drive N.W., Corydon, IN 47112. These care providers may testify regarding the care and treatment provided to Christopher following the subject crash. They are expected to testify consistently with their medical records, which are incorporated by reference.

18. Dr. Matthew F. Gornet, M.D., and medical care providers from The Orthopedic Center of St. Louis, 14825 N. Outer Forty Road, Suite 200, Chesterfield, MO 63107
    It is anticipated that Dr. Gornet will testify regarding his professional educational, background and training. He is expected to opine within a reasonable degree of medical certainty as to the causal relationship between plaintiff's incident of July 16, 2017 and his diagnoses of lumbar spine injury, including but not limited to annular tearing with disc protrusion at L5-S1. He is expected to testify as to Plaintiff's condition following the incident and the subsequent medical care and treatment he provided, including but not limited to performing an anterior decompression and disc replacement at L5-S1 on or about May 7, 2019.

    Dr. Gornet is expected to testify that he began treating Plaintiff on or about August 2, 2018. Dr. Gornet is expected to testify that in order to diagnose Plaintiff's injuries, various techniques were employed, including CT scans, MRI's and discography. He is expected to testify that these diagnostic tests helped him diagnose Plaintiff with disc injuries in Christopher's cervical and lumbar spine including annular tears and disc herniations. Dr. Gornet is expected to testify that it is his opinion, within a reasonable degree of medical certainty, that these disc injuries are causally related to

Plaintiff's on-duty injury of April 16, 2018. He is expected to testify that he attempted to treat Plaintiff's disc injuries conservatively with physical therapy and steroid injections administered by Dr. Helen Blake, M.D., to no avail. Dr. Gornet is expected to testify that once conservative measures failed, he performed disc replacements at C3-C5 on May 24, 2019, followed by subsequent disc replacements at C5-C7 on March 18, 2020. He is expected to testify that the procedures, while well-tolerated, were not successful in resolving all of Plaintiff's back problems and resolving his pain. He is expected to testify that he prescribed Plaintiff medication in an effort to further effectuate Plaintiff's recovery, but that effort proved unsuccessful. Dr. Gornet is expected to testify that Plaintiff has now reached maximum medical improvement, but he is unable to return to his previous railroad work as a result of the injuries he sustained on April 16, 2018; and that he has placed a permanent restriction of no lifting greater than 25 pounds, no overhead work, and no climbing on Plaintiff to protect him from further injury. He is expected to testify that the care he provided Plaintiff was reasonable and medically necessary to treat his injuries from April 16, 2018. Dr. Gornet is expected to testify that the charges for all services rendered to Plaintiff are fair and reasonable for like-kind services in the St. Louis Metropolitan area, and that most of them remain unpaid. Dr. Gornet is expected to testify that Plaintiff's injuries of April 16, 2018 have caused him pain and disability in the past and will cause him pain and disability in the future. Dr. Gornet is expected to testify consistently with his records, which are incorporated by reference, and any deposition he may give in this matter. Dr. Gornet may testify as to any information contained in his CV.

19. Dr. George Paletta, Jr., M.D.
    Dr. Paletta is expected to testify that he began treating Plaintiff on or about April 20, 2021. Dr. Paletta is expected to testify that in order to diagnose Plaintiff's injuries, an MRI study was performed. He is expected to testify that the MRI helped him diagnose Plaintiff with a superior labral tear (SLAP lesion) with associated paralabral cyst and distal clavicle edema. Dr. Paletta is expected to testify that it is his opinion, within a reasonable degree of medical certainty, that these shoulder injuries are causally related to Plaintiff's on-duty injury of April 16, 2018. Dr. Paletta is expected to testify that he performed surgery on Christopher on May 25, 2021. He is expected to testify that the care he provided Plaintiff was reasonable and medically necessary to treat his injuries from April 16, 2018. Dr. Paletta is expected to testify that the charges for all services rendered to Plaintiff are fair and reasonable for like-kind services in the St. Louis Metropolitan area, and that most of them remain unpaid. Dr. Paletta is expected to testify that Plaintiff's injuries of April 16, 2018 have caused him pain and disability in the past and will cause him pain and disability in the future. Dr. Paletta is expected to testify consistently with his records, which are incorporated by reference, and any deposition he may give in this matter. Dr. Paletta may testify as to any information contained in his CV.

20. Medical care providers from MFG Spine, L.L.C., 14825 N. Outer Forty Road, Suite

200, Chesterfield, MO 63107.  These care providers may testify regarding the care and treatment provided to Christopher following the subject crash.  They are expected to testify consistently with their medical records, which are incorporated by reference.

21. Medical care providers from Mason Pointe, 15455 Conway Road, Suite 342, Chesterfield, MO 63017.  These care providers may testify regarding the care and treatment provided to Christopher following the subject crash.  They are expected to testify consistently with their medical records, which are incorporated by reference.

22. Medical care providers St. Louis Spine & Orthopedic Surgery Center, 1130 Town & Country Commons Dr, Town and Country, MO 63017.  These care providers may testify regarding the care and treatment provided to Christopher following the subject crash.  They are expected to testify consistently with their medical records, which are incorporated by reference.

23. Any additional health care providers of Christopher Bruce, who may have knowledge of the causation, nature and extent of his injuries and the treatments they provided to him as a result of the crash of April 16, 2018.  These care providers may testify regarding the care and treatment provided to Christopher following the subject crash.  They are expected to testify consistently with their medical records, which are incorporated by reference.

24. John O. Ward, PhD
    William H. Rogers, PhD
    John Ward Economics
    8340 Mission Rd., Ste. 235
    Prairie Village, KS 62206

    Mr. Ward and Mr. Rogers are expected to testify that they are expert economists, and that they were retained to calculate Mr. Bruce's economic damages resulting from his on-duty incident and resulting injuries on April 16, 2018.  A summary of their opinions which they are expected to testify to is as follows:

| **Element of Economic Loss: Scenario A** | Past | Future | Total |
|---|---|---|---|
| Pre-injury earning capacity and pension | $206,059 | $1,933,592 | $2,139,650 |
| Pre-injury income and Medicare taxes | ($26,794) | ($298,478) | ($325,273) |
| Pre-injury health benefits | | $524,137 | $524,137 |
| Post-injury earning capacity: office support | | ($1,086,022) | ($1,086,022) |
| Post-injury income and Medicare taxes | | $101,478 | $101,478 |
| Household services | $10,191 | $154,116 | $164,307 |
| | $189,455 | $1,328,822 | **$1,518,277** |
| | | | |
| **Element of Economic Loss: Scenario B** | Past | Future | Total |
| Pre-injury earning capacity and pension | $206,059 | $1,933,592 | $2,139,650 |
| Pre-injury income and Medicare taxes | ($26,794) | ($298,478) | ($325,273) |
| Pre-injury health benefits | | $524,137 | $524,137 |

6

|  |  |  |  |
|---|---|---|---|
| Post-injury earning capacity: production |  | ($1,095,472) | ($1,095,472) |
| Post-injury income and Medicare taxes |  | $77,13 | $77,136 |
| Household services | $10,191 | $154,116 | $164,307 |
|  | $189,455 | $1,295,031 | **$1,484,486** |

They are expected to testify consistently with their report, which is incorporated herein by reference, containing their analysis and calculations of Mr. Bruce's economic damages along with any information contained in their C.V.'s which have also been previously produced. They are expected to testify consistently with their Fed. R. Civ. 26(a)(2) disclosures in this case.

25. Jesse R. Ogren, M.S., C.R.C., L.P.C., Vocational Rehabilitation Evaluator

Mr. Ogren is expected to testify that he is a vocational rehabilitation expert, and that he was retained to assess and opine on Plaintiff's vocational options and capabilities as a result of his on-duty incident and resulting injuries on April 16, 2018. A summary of Mr. Ogren's anticipated opinion testimony is as follows:

**CONCLUSIONS:**

Mr. Bruce was working at Norfolk Southern Railroad on April 16, 2018 as a conductor. He had just finished his day of work and was being picked up by a crew hauler van while the replacement locomotive engineer and conductor were dropped off at the train. Mr. Bruce explained that the driver of the van put the vehicle into reverse suddenly, and drove into a pole at a high rate of speed, breaking the pole. As a result of that injury, Mr. Bruce has not been able to return to work as a conductor at the Norfolk Southern Railroad, and he has yet to be released to work by his doctors.

Mr. Bruce was a conductor at the Norfolk Southern Railroad and he was hoping to become a locomotive engineer. He stated that other workers in his class were preparing for locomotive engineer training just after he was injured. At the time of his injury he stated that he was still working at a reduced rate from the full contracted rate of a conductor which is standard for newer hires. He reported that his best year of earnings at the Norfolk Southern Railroad was around $70,000. He expected that rate to increase as his seniority increased and he expected a significant increase when he began to work as a locomotive engineer.

Mr. Bruce has been unable to return to work in any capacity since the date of the injury, and during that time he has undergone several surgeries to treat symptoms relating to his injuries. He described two disc replacement surgeries in his cervical spine, the first one at C3/C4 and C4/C5, and the second one a year later at C5/C6 and C6/C7. He stated that the second surgery was more painful than the first, and then he underwent a surgery on his shoulder in May 2021. He stated that his doctors expect a 3-6 month recovery for his shoulder surgery, which took place on his dominant arm.

Mr. Bruce explained that he is returning to the doctor in 2022 to determine if he needs a low back surgery as well.

Mr. Bruce is currently out of work as he heals from his shoulder surgery last month. In my opinion, since the date of the injury on April 16, 2018, he has been unable to work in any capacity. He has been recovering from surgery continually during that time. During a period beginning in the middle of June 2020, Dr. Gornet released him to return to work with limitations. These limitations include "No lifting greater than 25 pounds. No overhead work. No climbing.", but despite these limitations Mr. Bruce underwent a third surgery to repair damage to his shoulder which removed him from work again.

Mr. Bruce stated that he hoped to return to work at the railroad, and that the limitations provided by Dr. Gornet did not allow him to be a conductor. He stated that the Norfolk Southern has not reached out to him regarding alternative employment, or any accommodated work that they could offer. He stated that he has not been contacted about returning to become a locomotive engineer. During the period of time when Mr. Bruce had been under restrictions, he stated that he was focused on returning to the railroad, and he continues to have hope he could return to his job.

Mr. Bruce and I discussed the difficulty of working on the railroad and the likelihood that he will need to pursue alternative employment. Based on the limitations from Dr. Gornet, which he described as likely "permanent" on September 28, 2020, it is my opinion that Mr. Bruce would be unable to return to the railroad as a conductor or as a locomotive engineer.

The recent shoulder surgery was completed by Dr. Gornet, and he has yet to provide additional, permanent restrictions. The limitations from 2020 would describe Mr. Bruce working at a sedentary or light level of occupational demands. He would be unable to return to any of the past work he has performed in the past, including jobs as a bore mill operator, heavy equipment operator, or as a plumber helper. These past employment settings would not provide any transferrable skills to alternative employment at the sedentary or light level, and Mr. Bruce would be considered an entry level employee at those types of jobs when he is cleared to return to work.

The types of employment available to Mr. Bruce, given his high school education and light level of functioning, would be limited. It is unclear if he would have additional restrictions on his right shoulder after he recovers from the surgery and as a result I will avoid factory occupations as potential job options. Factory and production jobs would require repetitive handling and reaching which would put additional stress on his neck and shoulder. It is my opinion, that when Mr. Bruce is released to work, he would be available for jobs in an office or retail environment that would not require lifting above 25 pounds. These types of jobs would be retail sales, front desk clerk, or cashier. These jobs would offer salaries of:

8

|  | Median Annual Salaries * |
|---|---|
| Front Desk Clerk | $23,260 |
| Retail Sales Clerk | $24,530 |
| Cashier | $22,740 |

*According to the Bureau of Labor Statistics

These occupations are examples of jobs Mr. Bruce could perform if he is given permanent limitations to the light or sedentary level. These jobs pay up to $24,530 per year, and would be available as soon as he is released to return to work by his doctors.

It is my opinion, that Mr. Bruce would have an earning capacity of $24,530 per year when he is released to return to work. This salary is based on median pay for jobs within his qualifications, and work available at the light or sedentary level.

Once Mr. Bruce is given permanent restrictions, I would be able to better define his earning capacity if necessary.

Mr. Bruce stated that he would like to pursue jobs similar to those he held in the past if he cannot return to the railroad. His past work would all be too physically demanding based on the past limitations provided by Dr. Gornet, but there are training programs that may be helpful to return Mr. Bruce to similar jobs within his abilities.

Mr. Bruce has discussed returning to school for a short, vocationally specific, training goal. Looking at the options available at Jefferson County Technical College, he showed interest in the program for CNC Machinist. This job is typically a medium position, but there are some positions in the field that could allow him to work within light restrictions. We discussed this possibility, and he stated that he would prefer to explore a program like this if it allowed him to pursue a new career. This program can be one year in length, with a cost of about $6,000. Mr. Bruce is signing up with the state Vocational Rehabilitation program, but it is unclear if they would be providing assistance for that cost.

If Mr. Bruce is able to return to school and pursue jobs within his physical abilities in the field of CNC machining, the JCTC website provides salary expectations of $33,549 per year. In my opinion, if Mr. Bruce is to return to school it will need to be a short, vocationally specific training program like the CNC machining program. It is unclear, however, if he will be physically able to perform work in this job based on his future physical restrictions. Having a year of training could allow him to qualify for jobs that would be physically appropriate, and he otherwise would not obtain. Mr. Bruce currently has a short period of machining experience from over ten years ago, and this training program would provide current skill training.

> It is my opinion that if Mr. Bruce is able to return to school to increase his qualifications for work, the program of CNC machining would be able to increase his future earning capacity to $33,549 after one year of study.
>
> Mr. Bruce is a young individual, and would have an expected 26 years of work life remaining until the Social Security retirement age of 67. His chosen career as a conductor and locomotive engineer at the Norfolk Southern is no longer available to him as a result of the injuries from April 16, 2018, and after being out of work for the last three years he is interested in returning to work as soon as possible. It is my opinion that the immediate job options listed above would be the types of openings he could pursue once he is returned to work, and the CNC machining program at JCTC would be the type of retraining he could use to start a new career.
>
> Mr. Ogren is expected to testify consistently with his report, which is incorporated herein by reference, along with any information contained in his C.V. which has been previously produced.  He is expected to testify consistently with his Fed. R. Civ. 26(a)(2) disclosure in this case.

26. Ashlyn Mattingly, Angela Yamaguchi, or Donna Wade
    Professional Medical Billing Accounts, LLC
    15455 Conway Road, Suite 342
    Chesterfield, MO 63017

    These witnesses may testify regarding the charges for medical services provided to Plaintiff by MFG Spine, LLC; The Orthopedic Center of St. Louis; Mason Pointe; CT Partners of Chesterfield; and MRI Partners of Chesterfield.  They are expected to testify that Plaintiff has unpaid medical bills with these providers, and that the charges for services provided to Plaintiff are fair and reasonable for like services in the St. Louis Metropolitan area.

27. Any witnesses identified through discovery that may have relevant information.

28. Any witnesses identified by any other party in their initial or final witness lists, without conceding the admissibility of their testimony.

29. Witnesses necessary to lay the proper foundation for any trial exhibits.

30. Any witnesses deposed in this matter.

Plaintiff reserves the right to supplement this list as necessary based on ongoing discovery and trial preparation as well as the Order on Case Management Plan.

## II. EXHIBITS

Plaintiff provides a description of documents or categories of documents in his possession, custody, and control which may be used to support his claims, except for documents covered by the attorney-client privilege or the qualified privilege for trial preparation materials, and documents which may be used solely for impeachment purposes:

1. Medical records and bills from Dr. Matthew F. Gornet, M.D. and other care providers at Orthopedic Center of St. Louis, 14825 N. Outer Forty Rd., Suite 200, Chesterfield, MO 63017

2. Medical records and bills from MFG Spine L.L.C.

3. Medical records and bills from Centers for Surgical Excellence

4. Medical records and bills from Mason Pointe

5. Medical records and bills from any other care providers who saw Plaintiff in relation to the injury alleged in his Complaint

6. Medical records and bills from any Dr. Douglas Mattingly and the Iroquois Medical, 5601 South 3rd St., Suite 100, Louisville, KY 40214

7. Medical billing records from Professional Medical Billing Accounts, LLC

8. Railroad Employee Injury and/or Illness Report (Form FRA F 6180.98)

9. Any reports or investigations regarding the crash of April 16, 2018 regardless of the party that created it

10. Investigation letter sent to Plaintiff by Norfolk Southern relating to the subject crash

11. Plaintiff's state and federal income tax returns for the years 2015 through the present

12. Plaintiff's W-2's from his employment with Defendant for the years 2015 through the present

13. Plaintiff's Personal Injury Report - Form 22 completed on or about April 16, 2018

14. John Humphrey's Personal Injury Report - Form 22 completed on or about April 16, 2018

15. Norfolk Southern Railway Company's medical file regarding Plaintiff

16. A job description for the job Plaintiff was working on April 16, 2018

17. Photos of the scene, van and crossing signal involved in the crash of April 16, 2018

18. United States Life Tables, 2002

19. Defendant's Safety, Operating, and General Conduct rule books

20. Any and all pleadings and depositions filed and taken in this cause

21. Any and all documents produced by plaintiff or defendant in this cause

22. Any and all documents and discovery served in this cause

23. Any and all requests to admit served in this cause

24. Plaintiff may use any documents identified by Defendants, without conceding their admissibility

25. Norfolk Southern Railway Company's personnel file for Plaintiff

26. Norfolk Southern Railway Company's Vocational Rehabilitation Services file for Plaintiff

27. Plaintiff's payroll records

28. Plaintiff's fringe benefits statement

29. Accident report prepared by the Indiana State Police or Harrison County Sheriff's Department

30. Any statement or reports completed by any witnesses or persons having knowledge of the subject crash.

31. Any exhibits listed by any other party to this matter

32. Transcripts of any depositions taken in this matter and exhibits attached thereto

33. Transcripts of the depositions of Mr. Merrell and Mr. Chand taken in cause 019FRS00112 currently pending before the U.S. Department of Labor and exhibits attached thereto

34. Reports of any Mr. Ward, Mr. Roger, and Mr. Ogren and any documents relied upon by these witnesses

35. Any agreements or contracts between the Defendants

36. Any documents identified list by any party in initial or final disclosures

37. Data collected from the onboard event recorder during the subject crash

Plaintiff reserves the right to supplement this list as necessary based on ongoing discovery and trial preparation as well as the Order on Case Management Plan.  This list does not include documents or other items necessary solely for impeachment or rebuttal purposes.

Respectfully submitted,

/s/ Ryan Brennan
Ryan Brennan
The Brennan Law Firm, P.C.
19 Bronze Pointe Blvd.
Belleville, Illinois 62226
(618) 236-2121
Fax:   (618) 236-1282
E-Mail:  ryan@feladlc.com
***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2021, service of a true and complete copy of Plaintiff's Final Witness and Exhibit List was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Ryan Brennan
Ryan Brennan
The Brennan Law Firm, P.C.
19 Bronze Pointe Blvd.
Belleville, Illinois 62226
(618) 236-2121

                Fax:  (618) 236-1282
                E-Mail:  ryan@feladlc.com
                ***Attorneys for Plaintiff***