UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| CHRISTOPHER L. BRUCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:20-cv-00040-RLY-MPB |
| | ) | |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ENTRY GRANTING IN PART AND DENYING IN PART PLAINTIFF'S
SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Christopher L. Bruce was injured while working for Norfolk Southern

Railway Company when a cab he was riding in backed into a metal pole.  The cab was

arranged through a chain of agreements between Defendants: Norfolk Southern,

Professional Transportation, Inc. ("PTI"), Yellow Cab Company of Louisville, LLC,[1] and

the cab driver, Anthony Shields.[2]  Bruce moves for partial summary judgment, requesting

a ruling that Yellow Cab and Shields were agents of Norfolk Southern for purposes of

---

[1] Yellow Cab was voluntarily dismissed from this action on May 15, 2023, without objection from any of its co-Defendants.  Because the present motion only seeks to establish that Yellow Cab acted as an agent of Norfolk Southern and PTI such that Norfolk Southern and PTI can be held liable for any wrongs Yellow Cab committed, Yellow Cab's rights are unaffected.

[2] The court noted in its May 4, 2023 Minute Entry that Anthony Shields has died.  As the court explained, the court will dismiss all claims relating to Shields if a motion to substitute is not made by any party or by the decedent's successor or representative within 90 days of the date of that order.  Similar to Yellow Cab, Shields's rights are unaffected by the present motion, which only seeks to impute liability to Norfolk Southern and PTI for any wrongs Shields may have committed.

Bruce's Federal Employer's Liability Act claim and agents of PTI for purposes of Bruce's general negligence claim.

For the reasons that follow, Bruce's motion for partial summary judgment is **GRANTED in part and DENIED in part**. The court finds Bruce has established that Yellow Cab and Shields acted as Norfolk Southern's agents under the Federal Employer's Liability Act, but he has not established they were agents of PTI under Indiana's agency principles.

## I.    Factual Background

Norfolk Southern entered into a Crew Transportation Contract with PTI, under which PTI agreed to provide transportation for Norfolk Southern's railway crews and equipment. (Filing No. 137-3, Crew Transportation Contract at 1). If PTI was unable to perform such services directly, it was required to make arrangements for "a duly-approved subcontractor" to perform the services. (*Id.* at 11). Norfolk Southern agreed to notify PTI at least ninety minutes in advance of a requested pick-up time. (*Id.*).

The Crew Transportation Contract specifies certain rights retained by Norfolk Southern. For example, Norfolk Southern reserved the rights to "specify routes to be used in performing the Services." (*Id.* at 2). PTI also agreed all of its vehicles are subject to inspection by Norfolk Southern and Norfolk Southern had "sole discretion" to temporarily or permanently bar any PTI party from Norfolk Southern property for failure "to act safely, respectfully, responsibly, [or] professionally." (*Id.* at 6–7). Norfolk Southern did not have the power to directly fire PTI drivers, (*see id.*), but it did

2

sometimes have conversations with drivers about operating vehicles in impermissible ways—such as speeding through the yard, (Filing No. 137-5, Shields Dep. at 48).

As permitted under the Crew Transportation Contract, PTI entered into a subcontractor agreement with Yellow Cab to provide transportation to customers of PTI. (Filing No. 137-4, Subcontractor Agreement). The one-page agreement contains little detail. (*Id.*). In practice, the arrangement worked like this: when a Norfolk Southern crew needed transportation, PTI would contact one of Yellow Cab's drivers—but not Yellow Cab directly because "Yellow Cab dispatchers didn't want to do that." (Shields Dep. at 28). PTI would tell the driver where to pick the crew up and where to drop them off. (*Id.* at 26). The driver could then either take the assignment or leave it for another driver. (*Id.*). The rates the driver charged were set by PTI's contract with Yellow Cab. (*Id.* at 29–30; Subcontractor Agreement).

Yellow Cab drivers, like Anthony Shields, were independent contractors who leased their cabs from Yellow Cab but "didn't work for them." (Shields Dep. at 11, 108). Starting in 2004, Shields drove railroad employees at the request of PTI seven days a week. (*Id.* at 109, 111). He was always called directly by PTI and was required to complete PTI's "run slips" picked up directly from PTI's office. (*Id.* at 11, 109–14).

Norfolk Southern also had some direct contact with Shields. Shields received safety training from the superintendent at Norfolk Southern once a year. (*Id.* at 38–39). The superintendent told Shields what was expected of him and what was expected of Norfolk Southern employees riding in Shields's cab. (*Id.* at 40). On at least one occasion, Shields had his vehicle inspected by a "Norfolk Southern police officer" to

3

ensure it was safe.  (*Id.* at 140–41).  Norfolk Southern could also tell Shields to change

destinations:

> [Y]ou did whatever the hell Norfolk Southern told you to do, or CSX. If they
> told you to take the crew on to another stop, that's what you did. . . . I mean,
> they can even tell you, you stay and assist the crew. You're liable to be there
> eight, ten hours sitting there twiddling your thumbs and may never do
> nothing else with them, but you're there in case they need you. So whatever
> they told you to do is what you did. . . . Quite frankly, you know, they're
> paying for it, so you got to do what they ask you.

(*Id.* at 143–44).  And Shields acknowledged that Norfolk Southern managers could have

kept him from driving Norfolk Southern employees if they chose to do so.  (*Id.* at 120–

21).

On April 16, 2018, Shields was called by PTI and asked to pick up a Norfolk

Southern train crew that included Christopher Bruce.  (*Id.* at 56; Filing No. 137-8, Bruce

Dep. at 129, 133).  Shortly after Bruce entered the vehicle, Shields backed the cab into a

pole.  (Bruce Dep. at 166).  Bruce claims the accident caused him to suffer whiplash and

injuries to his neck, rotator cuff, and back.  (*Id.* at 166, 169).

The first thing Shields did after the accident was call PTI so they could inform

Norfolk Southern—because PTI had instructed drivers to call it first in case of an

incident.  (*Id.* at 137).  After calling PTI, Shields called 911 before finally calling Yellow

Cab.  (*Id.*).

## II.    Legal Standard

The court may grant summary judgment only if "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists 'if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When considering a motion for summary judgment, the court must consider the evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences from that evidence in favor of the party opposing summary judgment. *Feliberty v. Kemper Corp.*, 98 F.3d 274, 277 (7th Cir. 1996).

## III.   Discussion

The Federal Employer's Liability Act ("FELA" or "the Act"), 45 U.S.C. § 51 *et seq.*, was intended to "provide broad remedial measures for railroad employees." *Green v. CSX Transp., Inc.*, 414 F.3d 758, 765 (7th Cir. 2005).  The Act holds railroads liable for an employee's injury if the railroad's negligence, or that of its agents, "played any part, even the slightest, in producing the injury." *Id.* at 766.  In keeping with the statute's broad remedial purpose, the Supreme Court announced in *Sinkler v. Missouri Pacific Railroad Company* that "an accommodating scope must be given to the word 'agents' to give vitality to the standard governing the liability of carriers to their workers injured on the job." 356 U.S. 326, 330–31 (1958).  The Court therefore held "that when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer" under the Act. *Id.* at 331.

In a prior entry, the court found the specific circumstances of *Sinkler* are not directly applicable to the facts of this case because neither Yellow Cab nor Shields were

"under contract" with Norfolk Southern.  (Filing No. 132, Order at 3–4 (quoting *Sinkler*, 356 U.S. at 331)).  However, the court reserved ruling on whether Yellow Cab and Shields qualify as Norfolk Southern's agents—as *Sinkler* broadened the term "agent" but did not displace normal agency principles.  *See, e.g.*, *Craig v. Atl. Richfield Co.*, 19 F.3d 472, 478 (9th Cir. 1994) ("The definition of 'agent' is broader under the *Hopson/Sinkler* doctrine than under the common law."); *Bush v. Metro-N. Commuter R.R.*, 552 F. Supp. 3d 298, 303–05 (D. Conn. 2021) (discussing approaches to agency under FELA in the absence of a direct contractual relationship).  And in determining whether an agency relationship exists in the context of FELA, the court is cognizant of the Supreme Court's direction that courts must give an "accommodating scope" to the word 'agents.'  *Sinkler*, 356 U.S. at 330–31.

In the same entry, the court determined that FELA does not apply to PTI, because it is not a railroad.  (Order at 4 (citing *Edwards v. Pac. Fruit Exp. Co.*, 390 U.S. 538, 540 (1968) (recognizing that § 51 applies only to "a railroad company acting as a common carrier"))).  But the Order recognized Yellow Cab and Shields could still be agents of PTI for the purposes of Bruce's ordinary negligence claim.

Because the agency question could substantially impact whether this case goes to trial, the court permitted Bruce to file a second summary judgment motion on this issue. *See Durigan v. Sanitary Dist. No. 4-Town of Brookfield*, 5 F. App'x 492, 495–96 (7th Cir. 2001) ("It is within the district court's discretion to deny a motion for summary judgment without prejudice to its being renewed at a later time, and may do so if good cause is shown."); *Gordon v. Veneman*, 61 F. App'x 296, 298 (7th Cir. 2003) (noting judicial

6

efficiency is a good reason to allow a second summary judgment motion, and a district court has broad discretion to manage its docket).  Bruce's second motion requests a finding that, at the time of the accident, Shields and Yellow Cab were agents of Norfolk Southern for purposes of Bruce's Federal Employer's Liability Act claim and agents of PTI for purposes of Bruce's ordinary negligence claim.  The court will first determine whether Yellow Cab and Shields qualify as agents of Norfolk Southern under FELA before turning to whether they were agents of PTI.

A.    **Whether Yellow Cab and Shields Were Agents of Norfolk Southern Under the Federal Employer's Liability Act**

Under basic principles of agency law, an agency relationship is formed when a principal expressly authorizes an agent to act on the principal's behalf.  *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020) ("Express authority exists when a principal expressly authorizes an agent and the agent acts on the principal's behalf and subject to the principal's control."); Restatement (Third) of Agency § 3.01 (2006). Norfolk Southern primarily argues that there is no evidence it formally appointed Shields as its agent.[3]  This is true insofar as the parties have not cited any evidence of a direct delegation of agency authority between Norfolk Southern and Shields, but the analysis does not end there.  Because Norfolk Southern clearly appointed PTI as its agent and permitted PTI to appoint a "duly-approved subcontractor" to perform the services PTI

---

[3] Norfolk Southern's control over Yellow Cab is barely discussed in the briefing, which is no surprise because Yellow Cab was in essentially the same position as Shields but with far less involvement in day-to-day operations.  For simplicity, the court will refer primarily to Shields here, because if he is an agent of Norfolk Southern by virtue of the chain of delegations, Yellow Cab is also an agent because it is a step up in the chain from Shields.

was authorized to perform on Norfolk Southern's behalf, (Crew Transportation Contract at 11), Yellow Cab and Shields were subagents.

"A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal."  Restatement (Third) of Agency § 3.15; *see also Smith v. State Farm Mut. Auto. Ins.*, 30 F. Supp. 3d 765, 775 n.4 (N.D. Ill. 2014) (St. Eve, J.) ("The federal common law of agency is in accord with the Restatement." (citations omitted)).  "An agent may appoint a subagent only if the agent has actual or apparent authority to do so."  Restatement (Third) of Agency § 3.15.

Here, Norfolk Southern unmistakably conveyed to PTI actual authority to appoint a subagent to perform the very taxi services PTI agreed to perform on Norfolk Southern's behalf.  (Crew Transportation Contract at 1 ("[PTI] may use subcontractors to perform the Services . . . ."); *id.* at 11 ("If [PTI] is unable to perform the Services directly, [PTI] shall make timely arrangement for a duly-approved subcontractor to perform the Services at the applicable Location(s)."); *see also id.* at 1 (defining the "Services" PTI agreed to provide as "transporting [Norfolk Southern's] crews and equipment" to locations directed by Norfolk Southern)).

So, when PTI delegated authority to Yellow Cab to perform the services for which PTI was ultimately responsible, PTI acted with actual authority on Norfolk Southern's behalf.  In performing those services as delegated by PTI, Yellow Cab was acting as PTI's subagent and therefore acting with actual authority on Norfolk Southern's behalf. Restatement (Third) of Agency § 315 cmt. d ("As between a principal and third parties, it

8

is immaterial that an action was taken by a subagent as opposed to an agent directly appointed by the principal.").  Likewise, when PTI procured the same services from Shields, Shields acted with actual authority on Norfolk Southern's behalf.[4]

This result makes sense in the context of the Federal Employer's Liability Act's broad remedial purpose.  Though *Sinkler* is not directly on point because Shields was not performing the services "under contract" with the railroad, 356 U.S. at 331, there is little doubt Shields would have been a *Sinkler* agent if he did have a contract with Norfolk Southern.  Even independent contractors like Shields can be 'agents' under FELA if they perform the operational activities of and are selected by the railroad.  *Randle v. Crosby Tugs, L.L.C.*, 911 F.3d 280, 284–86 (5th Cir. 2018), *as revised* (Jan. 7, 2019) (applying the Jones Act, which incorporates the FELA standards).  And numerous courts have held the "operational activities" of the railroad extend to taxi services hired by the railroad to transport its employees from its worksites.  *See, e.g.*, *Robinson v. CSX Transp., Inc.*, 535 F. Supp. 2d 875, 879–80 (N.D. Ohio 2008) (hiring of taxi services to take railroad workers to locations the railroad desired them to be constituted operational activities of the railroad); *Penn Cent. Corp. v. Checker Cab Co.*, 488 F. Supp. 1225, 1228 (E.D. Mich. 1980) (same); *see also Hopson*, 383 U.S. at 264 (use of taxi services to take seamen to U.S. Consul's office was ship's operational activity under the Jones Act).[5]  It would be an

---

[4] It does not matter whether this is viewed as PTI directly appointing Shields (by directly contacting him for each run and requiring him to fill out run slips) as a subagent or Yellow Cab appointing Shields as its own subagent.  If Shields is viewed as Yellow Cab's agent, the drivers that Yellow Cab agreed to provide are necessarily subagents.

[5] In response to Plaintiff's previous motion on the agency issue, which almost exclusively argued that the cab ride at issue was an operational activity of the railroad, Norfolk Southern did not

odd result to allow a railroad to circumvent *Sinkler* simply by allowing its agent to subcontract out the railroad's operational activities.

Norfolk Southern compares this case to *Randle v. Crosby Tugs*, 911 F.3d 280 (5th Cir. 2018), and *Craig v. Atlantic Richfield*, 19 F.3d 472 (9th Cir. 1994), but both cases are distinguishable.

In *Randle*, the plaintiff seaman suffered a stroke on board his employer's ship and was taken to a medical center by an ambulance at the direction of Louisiana's emergency response service. 911 F.3d at 281–82. He argued that the medical center was the shipowner's agent under the Jones Act, but the Fifth Circuit rejected that argument because the shipowner did not select the medical center and there was no evidence the shipowner even knew the ambulance would be directed to that particular medical center. *Id.* at 285–86. This case is very different. Not only did Norfolk Southern know Shields regularly drove its employees, it expressly authorized PTI to use subcontractors like Shields and Yellow Cab.

*Craig* is also distinguishable. There, the plaintiff worked on an offshore oil barge and was killed while being transported to work in an airplane operated by a charter company. 19 F.3d at 474. Plaintiff's estate sued his employers, the operators of the oil barge, which had a drilling contract with a large, nonparty oil company. *Id.* The oil company directed the defendants to move the barge to a lease concession operated by another nonparty. *Id.* The concession operator—not the defendant barge operators—

---

argue that the cab ride was not part of its operational activities. (*See* Filing No. 129 at 7 ("This question [of whether the cab ride was Norfolk Southern's operational activity] is immaterial[.]")).

entered into a contract with the aircraft charter company. *Id*. The defendants had the ability to request changes in the charter company's flight plans, but they lacked any ability to enforce their requests. *Id.* at 478. The Ninth Circuit thus affirmed the district court's finding that the defendants lacked actual control over the charter company sufficient to impute agency liability to the oil barge operators. *Id.* at 478–79.

In contrast, Norfolk Southern had actual control over Shields. It had the right to inspect his vehicle, specify routes to be used, or even bar him from the property. Though these rights are contained in a contract between Norfolk Southern and PTI, the contract also provides that Norfolk Southern has the right to withdraw approval for subcontractors "at any time in [Norfolk Southern's] sole discretion." (Crew Transportation Contract at 1). Moreover, Norfolk Southern actually exercised its control over Shields by requiring him to listen to safety training from its superintendent and by requiring him to submit to vehicle inspections. (Shields Dep. at 38–39, 140–41). And Shields generally understood that he should do "whatever the hell Norfolk Southern told [him] to do." (*Id.* at 143–44).

In short, especially considering the accommodating scope given to the word 'agents' under FELA, Norfolk Southern can be held liable for the actions of Yellow Cab and Shields under a theory of subagency. Restatement (Third) of Agency § 3.15 cmt. d ("As to third parties, an action taken by a subagent carries the legal consequences for the principal that would follow were the action instead taken by the appointing agent.").

## B.   Whether Yellow Cab and Shields Were Agents of PTI

Next, Bruce argues Yellow Cab and Shields were agents of PTI. As the court explained in its last order, PTI is not subject to liability under § 51 of FELA because PTI

11

is not a railroad. *Edwards*, 390 U.S. at 540. So, as the court understands Bruce's claim against PTI, it is necessarily a state law negligence claim under Indiana law. Indiana's agency principles would therefore apply—not federal common law. Bruce, however, did not brief Indiana agency law.

While some of Indiana's agency principles appear identical to the federal common law, *see e.g.*, *Yost v. Wabash Coll.*, 3 N.E.3d 509, 518–19 (Ind. 2014) (describing creation of an agency relationship), the analysis could be different because Shields might be an independent contractor. Under FELA, an independent contractor is not precluded from being an agent of the railroad. *Sinkler*, 356 U.S. at 328, 331 ("independent contractor" was nonetheless a FELA agent). But the longstanding general rule in Indiana is that a principal is not liable for the negligence of an independent contractor. *Moberly v. Day*, 757 N.E.2d 1007, 1009 (Ind. 2001). Because Bruce did not brief Indiana law on this issue, the court denies his motion for partial summary judgment with respect to his state law negligence claim against PTI.

## IV.    Conclusion

Bruce's second motion for partial summary judgment (Filing No. 137) is

**GRANTED in part and DENIED in part**.  It is **GRANTED** to the extent that he has

established Yellow Cab and Shields were agents of Norfolk Southern under the Federal

Employer's Liability Act.  However, it is **DENIED** with respect to whether Yellow Cab

and Shields were agents of Professional Transportation, Inc., for the purposes of Bruce's

state law negligence claim.

**IT IS SO ORDERED** this 22nd day of May 2023.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana



Distributed Electronically to Registered Counsel of Record.